UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ASSOCIATED MUSICIANS OF GREATER NEW
YORK, LOCAL 802, AFM,

                          Petitioner,

          -v-

THE LEAGUE OF AMERICAN THEATRES AND
PRODUCERS, INC.,

                          Respondent.

Case No. 05-CV-2769 (KMK)

OPINION AND ORDER

Appearances:

Harvey S. Mars, Esq.
Law Office of Harvey S. Mars LLC
New York, New York
*Counsel for Petitioner*

Neil H. Abramson, Esq.
Brian S. Rauch, Esq.
Proskauer Rose LLP
New York, New York
*Counsel for Respondent*

KENNETH M. KARAS, District Judge:

      No longer under the bright lights of Broadway, the Elvis Presley inspired musical *All
Shook Up*, finds itself where many successful Broadway shows end up: in federal court.[1]

_____

      [1]*See, e.g.*, *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) (*Hair*);
*Thomson v. Larson*, 147 F.3d 195 (2d Cir. 1998) (*Rent*); *Carell v. Shubert Org., Inc.*, 104 F.
Supp. 2d 236 (S.D.N.Y. 2000) (*Cats*); *Roberts v. Atlantic Recording Corp.*, 892 F. Supp. 83
(S.D.N.Y. 1995) (*Smokey Joe's Café*); *Wasserman v. Leigh*, No. 92 Civ. 5266, 1994 WL 320606
(S.D.N.Y. July 1, 1994) (*Man of La Mancha*); *Viewhaven, Inc. v. Danon*, No. 85 Civ. 9603, 1986
WL 6779 (S.D.N.Y. June 12, 1986) (*La Cage Aux Folles*).

Petitioner Associated Musicians of Greater New York, Local 802, AFM ("The Union" or "Petitioner") brings this action seeking partial vacatur of the December 18, 2004 arbitration award in favor of Respondent The League of American Theatres and Producers, Inc. ("The League" or "Respondent").  For the reasons explained below, the petition to partially vacate the arbitration award is DENIED.

## I.  Background

### A. The Parties and the Collective Bargaining Agreement

The Union is an unincorporated association that represents musicians employed by League members.  (Verified Pet. to Vacate an Arbitration Award ¶¶ 2, 3 ("Pet.").)  The League is a multi-employer association that coordinates the collective bargaining of its member Broadway theatres and producers.  (Pet. ¶ 3.)  On March 11, 2003, following a labor strike that temporarily shut down Broadway, the Parties signed a Memorandum of Agreement, expanding and modifying the collective bargaining agreement ("CBA") applicable for the time period underlying the events in dispute brought forth in this Petition.  (Pet. ¶ 4, Ex. A.)  One of the more contentious issues that the Parties negotiated, and the subject of this Petition, was the minimum number of musicians that League member theatres would be required to employ for each of their musical productions at particular theatres.[2]  (Pet. ¶ 5.)  To reach an agreement, the Parties compromised on two issues.  First, they agreed to slightly reduce the minimum number of

---

[2]The 2003 Agreement was a successor to the Parties' previous collective bargaining agreement which expired on March 2, 2003.  (Pet. ¶ 4, Ex. B.)  The current Agreement, which was in effect at the time this dispute arose, expires on March 5, 2007.  (Pet. Ex. J at 3.)  In light of this litigation, the issue of musician minimums will likely be re-negotiated yet again, next March.  The Court can only say, *"Look Out Broadway."*  Elvis Presley, *Look Out Broadway*, on FRANKIE AND JOHNNIE (RCA 1966).

2

musicians and retain these minimums for ten years.   (Pet. ¶ 6, Ex. A.)  Second, the Parties agreed

to revise the "Special Situations" section of the Agreement, which permits a member of the

League to apply for an exception to the minimum number of musicians required under the CBA.

(Pet. ¶ 7.)

To obtain an exception to the minimum musician requirement, a League member must

demonstrate that there are legitimate artistic reasons why the production should be permitted to

use fewer than the required number of musicians.  An application for an exception is first

reviewed by a Special Situations Committee ("Committee"), comprised of experts in the field of

theatrical production, who are chosen in advance by the Parties.  (Pet. ¶ 10, Ex. A at 11.)[3]  Both

Parties may present documentary evidence and call witnesses when they appear before the

Committee.  (Pet. ¶ 10.)  The Committee is required under the Agreement to "decide the issue

primarily on artistic considerations."  (Pet. Ex. A at 12.)  Specifically, the Committee is to

consider four factors:  "(I) the musical concepts expressed by the composer and/or orchestrator;

(ii) whether the production is of a definable musical genre different from a traditional Broadway

musical; (iii) the production concept expressed by the director and/or choreographer; and/or (iv)

whether the production recreates a pre-existing size band or band's sound (on or offstage)."  (Pet.

Ex. A at 12.)  After considering the Parties' presentations, the Committee must render "a written

decision explaining in detail the basis for its conclusions" within forty-eight hours after the

Parties have submitted their positions.  (Pet. ¶ 10, Ex. A at 12.)

The CBA also provides an avenue by which either party can seek review of the

_____

[3]Two different documents with similar page number ranges appear in Pet. Ex. A.
References to pages numbers in Exhibit A in this Opinion are to the second document, which is
the CBA.

Committee's decision.  The CBA states that:  "In the event that the Employer/Producer or the Union does not agree with the Committee's determination, either party may submit the matter to binding arbitration before an arbitrator selected pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Association."  (Pet. ¶ 11, Ex. A at 11-12.)  The CBA further states that, "[O]nce it has reached a decision, the Committee shall retain jurisdiction to consider any appropriate matters concerning, for example, either the implementation of its decision or any change in concept of the production at issue, which, inter alia, might lead to a reconsideration of its prior decision."  (Pet. Ex. A at 12.)

B. *All Shook Up*

On June 8, 2004, the Union received a request from the producers of a new Broadway production entitled *All Shook Up*, seeking Special Situation status.  *All Shook Up* was a musical based on the songs of Elvis Presley, and the producers of the show, in support of their request, stated that they sought "to create a sound for the show that emulates a typical early-Elvis-type 'band'; a sound that is not consistent with the traditional 'Broadway' sound."[4]  (Pet. Ex. J at 5.) In keeping with this artistic approach, the producers sought to employ the services of a 15-person orchestra, as opposed to the required 19-person orchestra for the Marquis Theater, where the musical was scheduled to debut.[5]  (Pet. Ex. E.)  The Union denied the producers' request, and subsequently, the Parties convened the Committee on September 30, 2004 to consider whether

---

[4]Despite the theatrical adage that, "The show must go on," *All Shook Up* ended its run on Broadway on September 25, 2005.  *See* Internet Broadway Database, http://www.ibdb.com/production.asp?ID=383114.

[5]The theater was later switched to the Palace Theater, which requires a minimum of 18 musicians.  (Pet. ¶ 13.)

Special Situation status was warranted.  (Pet. ¶ 14.)  The Committee heard witness testimony and reviewed evidence submitted by both sides.  (Pet. Ex. J at 1-10.)  In particular, the Committee heard the testimony of two witnesses from the production:  Stephen Oremos, the Music Director and Arranger, and Michael Gibson, the Orchestrator.  In support of their bid to obtain Special Situation status, they testified that the musical concept for the production was to present Elvis Presley's music with a "gospel overlay."  (Pet. Ex. J at 5.)

After reviewing all of the evidence, the Committee denied the producers' request and issued an opinion, stating that:

> The majority of the Committee had difficulty reconciling the stated desire of the orchestrator with respect to his views of the orchestration as requested and the written request of the producers, the oral testimony and the written rebuttal of the orchestrator in this case.

> The majority opinion of the Committee found that the stated concept for this musical was not proven sufficiently to require a reduction in the minimum number from that which comprises a conventional Broadway orchestra.

(Pet. ¶ 15, Ex. G.)

C. Arbitration

On October 5, 2004, Respondent's counsel requested "binding arbitration" in order to review the Committee's decision and to ultimately *"Patch It Up."*[6]  (Pet. ¶ 16.)  The Parties agreed on an arbitrator and arbitration hearings were held on November 18, 2004 and December 3, 2004.  (Pet. ¶¶ 16, 17.)  The Arbitrator presented the issue before her as, "Whether the musical 'All Shook Up' qualifies as a 'Special Situation' under the March 11, 2003 Memorandum of

---

[6]Elvis Presley, *Patch It Up*, on PATCH IT UP (RCA 1970).

5

Agreement." (Pet. Ex. J at 1.) In the estimation of the Arbitrator, it was appropriate for her to

reach this question because "both the League and the Union saw arbitration as a safety net in the

event that either side believed the Committee decision to be flawed." (Pet. Ex. J at 21.)

One of the related questions presented in the arbitration was the standard of review that

the Arbitrator would apply. On December 18, 2004, the Arbitrator issued an Opinion and Award

in which she determined that the Committee committed a "procedural violation in its

deliberations" and that, over the Union's objection (Pet. ¶ 17), she would apply a *de novo*

standard of review to the Committee's decision. (Pet. Ex. J at 20.)

Despite the Arbitrator's decision to employ a *de novo* standard of review, she explained

that "the parties' [sic] intended the Committee decision to be considered as part of the evidence

of the de novo review." (Pet. Ex. J at 21.) She therefore considered the Committee's decision in

the arbitration. The Arbitrator's deference to the Committee's decision was limited, however,

because she found that the Committee's written decision was both procedurally and substantively

flawed. She explained that the Committee's decision was procedurally flawed because it relied

on impermissible factors, and the decision was substantively flawed, because it lacked the

requisite detail and explanation necessary to give the decision any "substantial weight." (Pet. Ex.

J at 22.) Based on these reasons, and all of the evidence presented at the arbitration, the

Arbitrator concluded that "the proposed instrumentation, which includes both the number and

type of instruments, was driven by the 'musical concept'" for *All Shook Up*, as articulated by the

composer and orchestrator. (*Id*. at 25-26.) The Arbitrator, therefore, decided that the League had

carried its burden and that the production was entitled to Special Situation status, thus permitting

the production to use a smaller orchestra. (Pet. ¶ 18, Ex. J at 27.)

Rather than resolve amicably the Parties' dispute, the arbitration produced a *"A Mess of Blues."*[7]  Following the Arbitrator's Opinion and Award, the Union filed a verified petition to vacate the portion of the arbitration award which determined that *All Shook Up* was entitled to Special Situation status.  The Union petitions this Court to remand the matter back to the Committee for reconsideration and award of attorneys' fees and costs.  Naturally, the League opposes the Union's request.

II.  Discussion

A.  Standard of Review for Arbitration Awards

This Court's grant of authority to review arbitration awards is limited.  *See* 9 U.S.C. § 10(a) (setting out grounds for vacating an arbitration award).  Circumscribed review ensures that the "twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation" are fulfilled.  *Folkways Music Publishers v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993).  Thus, the party seeking to vacate an arbitration award bears a high burden to avoid summary confirmation.  *See Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir. 1997); *Folkways Music Publishers*, 989 F.2d at 111; *Technical Career Inst., Inc. v. Local 2110, UAW*, No. 00 Civ. 9786, 2002 WL 441170, at *3 (S.D.N.Y. Mar. 21, 2002).  The Supreme Court has held that, "[a]s long as the arbitrator's award 'draws its essence from the collective bargaining agreement,' and is not merely 'his own brand of industrial justice,' the award is legitimate."  *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987); *see also Wackenhut Corp. v. Amalgamated Local 515*, 126 F.3d 29, 31 (2d Cir. 1997) (same); *Saint Mary Home, Inc. v. Service Employees Int'l Union, Dist. 1199*, 116 F.3d 41, 44 (2d

---

[7]Elvis Presley, *A Mess of Blues*, on A MESS OF BLUES (RCA 1960).

Cir. 1997) (same).  This holds true even if the reviewing court disagrees with the factual findings

of the Arbitrator or her interpretations of the contract.  *See Misco*, 484 U.S. at 36 ("The courts are

not authorized to reconsider the merits of an award even though the parties may allege that the

award rests on errors of fact or on misinterpretation of the contract."); *Local 1199, Drug, Hosp.*

*and Health Care Employees Union v. Brooks Drug Co.*, 956 F.2d 22, 25 (2d Cir. 1992) (noting

that an arbitration award should be upheld even if an interpretation of the contract is "plainly

wrong" (citations omitted)).

Under this highly deferential standard, the Second Circuit has held that an arbitration

award must be upheld when "the arbitrator 'offer[s] even a barely colorable justification for the

outcome reached.'"  *Wackenhut Corp.*, 126 F.3d at 31-32 (quoting *Andros Compania Maritima,*

*S.A. v. Marc Rich & Co.,* 579 F.2d 691, 704 (2d Cir. 1978)).  In the end, "[t]he contractual theory

of arbitration . . . requires a reviewing court to affirm an award it views as incorrect-even very

incorrect-so long as the decision is plausibly grounded in the parties' agreement."  *Wackenhut*

*Corp.*, 126 F.3d at 32.[8]

B. Analysis

The Union objects to the Arbitrator's decision to adopt a *de novo* standard of review.

(Petitioner's Mem. of Law. In Supp. of Verified Pet. to Vacate an Arbitration Award at 13

("Petr.'s Mem.").)  The Union also argues that the Arbitrator exceeded her authority under the

---

[8]There is one narrow exception to the deferential standard of review.  The Supreme Court
has found exception "[i]f the contract as interpreted by [the arbitrator] violates some explicit
public policy, we are obliged to refrain from enforcing it."  *W.R. Grace & Co. v. Local Union*
*759, Int'l Union of United Rubber of Am.,* 461 U.S. 757, 766 (1983); *accord St. Mary Home*, 116
F.3d at 46; *Technical Career Inst.*, 2002 WL 441170, at *3.  Petitioner does not invoke this
exception, and the Court does not consider it here.

CBA when she decided that the League was entitled to Special Situation status.  (*Id*. at 4-12.)
Both decisions, the Union contends, are contrary to the intent of the Parties, as reflected in the
CBA.  (*Id*. at 9.)  In particular, the Union argues, in an attempt to depict the Arbitrator's award as
*ultra vires*, that the Arbitrator based the arbitration award, and her interpretation of the CBA, on
factors found outside the CBA.  The better interpretation of the CBA, the Union contends,
required the Arbitrator to remand the ultimate issue of whether the production is entitled to
Special Situation status back to the Committee, because under the CBA, the Committee retains
jurisdiction over that issue.  (*Id*. at 10-11.)  In effect, the Union suggests, *"Return to Sender."*[9]
Because the Court finds that the Arbitrator arguably drew her conclusions, and ultimately, the
Award from the essence of the CBA, this case presents *"(Such An) Easy Question."*[10]

 The Court begins with the Arbitrator's decision to adopt a *de novo* standard of review.
The Arbitrator stated that based on the CBA, she found that there were three reasons why *de
novo* review was appropriate.  (Pet. Ex. J at 19.)  First, the Arbitrator found that the arbitration
provision of the CBA – that the parties "may submit the matter to binding arbitration" – did not
include any limitation on the Arbitrator's authority and did not refer to the Committee's decision.
(*Id*.)  In this regard, the Arbitrator noted that the Parties expressed a desire for deference in other
portions of the CBA, but not in this section.  (*Id*.)  Second, the Arbitrator explained that the
Union conceded that the CBA authorized the Arbitrator to cure any of the Committee's
procedural defects, if there were any.  In her view, under the CBA, the best way to achieve that

---

[9]Elvis Presley, *Return to Sender*, on ELVIS SINGS RETURN TO SENDER AND WHERE DO
YOU COME FROM (RCA 1962).

[10]Elvis Presley, *(Such An) Easy Question*, on POT LUCK (RCA 1962).

end was through *de novo* review.  (*Id*. at 20.)  Third, the Arbitrator found that the CBA did not

express an intent by the Parties to have the Arbitrator return the matter to the Committee at all,

let alone to correct procedural defects in their decisions.  (*Id*.)  In support of this point, the

Arbitrator explained that the CBA's prohibition on Committee members testifying at the

arbitration suggested that parties intended the arbitrator to conduct a *de novo* review of the

Committee's decision.  (*Id*.)

The Arbitrator's detailed explanation of her reasons for adopting a *de novo* standard of

review and curing the Committee's procedural defect, whether or not explicitly provided for in

the CBA, was clearly based on the essence of the CBA, thus ending the inquiry.  *See Misco*, 484

U.S. at 36; *Int'l Ladies' Garment Workers' Union v. Country Miss, Inc.*, No. 91 Civ. 7781, 1992

WL 297585 (S.D.N.Y. Oct. 8, 1992) (affirming arbitration award because it draws its essence

from the collective bargaining agreement).  As the discussion above makes clear, the Arbitrator's

decision was grounded in the language of the CBA itself.  Such reliance on the CBA surpasses

the requirement that the decision be based on the "essence" of the agreement.  The Arbitrator's

explanation also surpasses the very low threshold required by *Wackenhut Corp.* that an

arbitrator's justification must be "barely colorable."  126 F.3d at 31-32.  In addition to noting the

language barring the Committee members from testifying at the arbitration, the Arbitrator cited

the plain language of the Special Situations status section, which demonstrates that the Parties

intended that an adverse determination by the Committee could be submitted to an arbitrator for

binding arbitration.  This language, the Arbitrator concluded, permitted her not only to opine on

the procedural framework employed by the Committee, but allowed her to review "the

Committee's determination," i.e., its decision on the merits.  Thus, the Court cannot say that the

Arbitrator imposed her own brand of industrial, or more appropriately, theatrical justice.  *See*

*Misco*, 484 U.S. at 36.

The Arbitrator also considered evidence of the Parties intent during the arbitration

hearing.  (Pet. Ex. J at 10-19.)  For example, based on the testimony of Bill Moriarty, the former

President of the Union, the Arbitrator concluded that both Parties "saw arbitration as a safety net

in the event that either side believed the Committee decision to be flawed."  (Pet. Ex. J at 21.)

By relying, in part, on Moriarty's testimony, the Arbitrator was considering evidence found

outside the four corners of the CBA solely to determine the Parties' intent, and Second Circuit

precedent permits her to do just that.  *See Local 1199*, 956 F.2d at 25 ("[I]n interpreting a

collective bargaining agreement, an arbitrator may not even be bound by the common law

contract parol evidence rule." (citations omitted)).  The Arbitrator decided that, because the

Committee's decision was bereft of any substantive guidance, she would construe the safety net

in this case to include *de novo* review of the League's request for Special Situation status.  The

Arbitrator's decision is consistent with "[f]ederal policy [which] requires us to construe

arbitration clauses as broadly as possible[,]" *Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*, 58

F.3d 16, 19 (2d Cir. 1995) (internal quotation and citation omitted)), which militates in favor of

the League.

The Union urges the Court to vacate the Arbitrator's Award for several reasons.  First, the

Union challenges the Arbitrator's reading of the CBA, arguing that the Parties did not intend for

the Arbitrator to employ *de novo* review of the Committee's decision.  The Union points to the

different portions of the CBA that it argues demonstrates that *de novo* review is inappropriate.

For example, the Union states that the CBA requires the Committee to "decide the issue based

11

primarily on artistic considerations" (Petr.'s Mem. 9), and it urges the Court to read that

requirement in conjunction with the last paragraph of the Special Situations provision, which

states that:  "[o]nce it has reached a decision, the Committee shall retain jurisdiction to consider

any appropriate matters concerning, for example, either the implementation of its decision or any

change in concept of the production at issue, which, inter alia, might lead to a reconsideration of

its prior decision."  (*Id.*)  In particular, the Union claims that *de novo* review of Special Situation

status would render this final paragraph of the Special Situations section of the CBA superfluous.

(Pet. Mem. 12-13.)

      The Union's position here boils down to urging a different interpretation of the CBA than

the one adopted by the Arbitrator.  This argument fails.  For example, the Court need not decide

whether the arbitration and the Committee jurisdiction provisions of the CBA are in tension with

each other.  For purposes of deciding the merits of this Petition, the Court need only find, and

does in fact find, that the Union's argument amounts to nothing more than Petitioner saying that

the Arbitrator misinterpreted the CBA, which is not legally sufficient for the Court to vacate the

Award.  *See Wackenhut*, 126 F.3d at 34 (noting that multiple interpretations of contract results in

affirming arbitration award); *Grosso-Jacobson Prod., Inc. v. Dir's. Guild of Am., Inc.*, No. 89

Civ. 5400, 1990 WL 26294, at *4 (S.D.N.Y. Mar. 5, 1990) (holding that at least two

interpretations of contract were reasonable and affirming arbitration award).

      Simply put, this Court does not sit as an appellate court of errors when reviewing

arbitration awards, and accordingly, it does not determine the best interpretation of the CBA.  To

do so would not only contravene firmly established precedent, but it would undermine sound

policy interests underlying arbitration.  *See Nat'l Bulk Carriers v. Princess Mgmt.*, 597 F.2d 819,

825 (2d Cir. 1979) ("Arbitration cannot achieve the savings in time and money for which it is justly renowned if it becomes merely the first step in lengthy litigation."(citations omitted)).  In sum, this Court is required to affirm an "an award it views as incorrect-even very incorrect-so long as the decision is plausibly grounded in the parties' agreement."  *Wackenhut Corp.*, 515 126 F.3d at 32.[11]

Second, the Union contends that the Arbitrator injected her own notions of justice when she explained in the Opinion and Award that the most "logical" way to cure the procedural defect was to employ a *de novo* standard of review.[12]  (Pet. Ex. J at 20.)  The Union suggests that the Arbitrator's reliance on "logic" to interpret the contract was in error.  However, the Supreme Court has made clear that an arbitrator is "to bring his informed judgment to bear" when interpreting a contract.  *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).  An arbitrator must also "explicate his reasoning under the contract."  *In re Marine Pollution Serv., Inc.*, 857 F.2d 91, 94 (2d Cir. 1988).  The Court takes these requirements to encourage, not prohibit, arbitrators from employing logic to interpret contracts.  As long as the Arbitrator's logic draws the Award from the essence of the agreement – as it does here – this Court must affirm the Award.  *See United Steelworkers*, 363 U.S. at 597.

In support of its general claim, that the Arbitrator acted *ultra vires*, Petitioner relies on two Second Circuit cases that have vacated an arbitration award.  Those cases are inapposite.  In *Harry Hoffman Printing, Inc. v. Graphic Commc'ns Int'l Union, Local 261*, 950 F.2d 95, 99 (2d

---

[11]This is not to suggest that the Court considers the Arbitrator's Award to be very incorrect or even incorrect, but only that the Union falls far short of the mark it needs to prevail in its Petition.

[12]This argument was first made at oral argument.

Cir. 1991), the Second Circuit affirmed the lower court's vacatur of an arbitration award in which the arbitrator relied on an exogenous concept of "elementary due process," which was not present in, or considered by, the parties' collective bargaining agreement.  Unlike in *Harry Hoffman*, the Arbitrator in this matter did not import a concept to decide the arbitration that is unfounded in the CBA.  Rather, the Arbitrator reasoned, based on the language of the CBA, that *de novo* review of the production's status was intended by the Parties.  Petitioner also cites *Matter of Arbitration Between Melun Indus., and Strange*, 898 F. Supp. 990 (S.D.N.Y. 1990), in which an arbitration award was vacated because the arbitrator exceeded his authority by relying on facts which took place outside of the agreed time span in the arbitration agreement.  *Id*. at 993-95.  Here, there was no such usurpation of authority to decide issues not contemplated by the parties in the CBA.

Third, Petitioner suggests that, the CBA only calls for "binding arbitration" as opposed to final and binding arbitration also is unavailing.  However, "binding" arbitration includes the element of finality.  *See Federal ADR Program Manager's Resource Manual*, Part III: Chapter 1, "Glossary of Terms and Techniques," at http://www.adr.gov/manual/Part3_Chap1.pdf (defining "binding arbitration" as "[a] private adversarial process in which the disputing parties choose a neutral person or a panel of three neutrals to hear their dispute and to render a *final and binding* decision or award") (emphasis added).  Thus, as before, this claim fails, because it is nothing other than a quibble with the Arbitrator's interpretation of the CBA, and not proof that she introduced an extraneous consideration in contravention of the CBA.

Finally, Petitioner argues that pursuant to 18 U.S.C. § 10(a)(4), an arbitration award may be vacated when the arbitrator fails to render a mutual, final, and definite award upon the subject matter.  (Petr.'s Mem. 13-14.)  Petitioner claims that by failing to consider the effect that the

14

arbitration clause has on the Committee's jurisdiction under the CBA, the Arbitrator has failed to render a mutual, final, and definite award.  The Court has already rejected the premise of that claim — that the Arbitrator was required to find the two provisions to be necessarily at odds with each other.  Furthermore, it is not incumbent upon an arbitrator to explain or justify every aspect of her decision in order for the Court to affirm the award.  *See Fahnestock & Co. v. Waltman*, 935 F.2d 512, 516 (2d Cir. 1991) ("[I]f a ground for the arbitrator's decision can be inferred from the facts of the case, the award should be confirmed." (citation and internal quotation marks omitted)); *Int'l Ladies' Garment Workers' Union*, 1992 WL 297585, at *4 n.1 ("[W]hile the Arbitrator here may not have set forth every detail of her decision and may not have justified every aspect of her decision in light of the parties' various agreements, there are no irreconcilable inconsistencies between the Award and the various agreements.").  This is particularly true where, as here, Petitioner could not even say, or point to anything in its Petition or the documents accompanying the Petition saying, that the Petitioner asked the Arbitrator to consider the jurisdiction section of the CBA.  Thus, the Court rejects this claim.

## III. Conclusion

Petitioner's motion to vacate the arbitration Award is DENIED. The Clerk of the Court is

directed to enter judgment accordingly and to close this case, because *"It's Over."*[13]

SO ORDERED.

Dated:    October 25, 2006
          New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[13]Elvis Presley, *It's Over*, on ALOHA FROM HAWAII VIA SATELLITE (RCA 1973).

16

Service List:
Harvey S. Mars, Esq.
Law Office of Harvey S. Mars LLC
322 West 48th Street
New York, New York 10036
212-765-4300
Fax: 212-765-2775
*Counsel for Petitioner*

Neil H. Abramson, Esq.
Brian S. Rauch, Esq.
Proskauer Rose LLP
1585 Broadway
New York, New York 10036
212-969-3001
Fax: 212-969-2900
*Counsel for Respondent*

17